UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA          :
                                  :
        v.                        :    Case No. 2:08-CR-138
                                  :
PATRICK MASTERSON                 :

**OPINION and ORDER**

Defendant Patrick Masterson has filed a Motion to Suppress any evidence seized as a result of a motor vehicle stop on November 28, 2008 (Doc. 25). Masterson concedes that the initial traffic stop was justified, but asserts that the length of his detention and the scope of questions asked of him violated his Fourth Amendment rights. He argues that since the detention was unconstitutional, any evidence discovered by the police must be suppressed. For the reasons stated below, the Motion to Suppress is **denied**.

**FACTUAL BACKGROUND**

At approximately 11:15 a.m. on November 28, 2008, Masterson arrived at the Derby Line, Vermont Port of Entry. Masterson told Customs and Border Protection Officer Petelle that he intended to visit an aunt who lived in Burlington. Masterson had difficulty answering simple questions, and appeared to Officer Petelle to be nervous. Officer Petelle referred Masterson for secondary inspection.

At secondary inspection Masterson originally declared that

he was carrying $240 in U.S. and Canadian currency.  Masterson eventually admitted that he was carrying $5,000 in U.S. currency, and he claimed that he intended to use the cash to buy a printer. After being confronted with the fact that the printer he intended to buy cost approximately $60,000, Masterson maintained that the cash was his and that he possessed it because he had recently completed a printing job.  A canine search of Masterson's vehicle showed interest, but a search of the vehicle uncovered no contraband.

Special agents of Immigration and Customs Enforcement ("ICE") were called to the scene.  At approximately 12:00 p.m., Special Agent Trevor Walker interviewed Masterson while Special Agent Jaime West searched Masterson's Blackberry pursuant to his consent.  Agent Walker observed the defendant to be nervous and to have trouble answering questions.  Agent West observed emails in Masterson's Blackberry between persons identified as "Red" and "Gor" about hay bales.  Agent West found it suspicious that a printer would be emailing about hay bales.  Agent West determined that further surveillance of Masterson was warranted.

At approximately 1:00 p.m., Masterson left the Port of Entry with the ICE agents following behind him.  He traveled to the long-term parking lot of the Burlington Airport in South Burlington, Vermont, arriving at approximately 4:00 p.m.  The agents observed Masterson transfer his belongings from the

vehicle he had been driving to a silver Ford F-150 pickup truck. The agents then followed Masterson to a residence/farm located at 1765 Baird Road in Barton, Vermont, where he arrived shortly after 7:30 p.m. Agent West was unable to maintain continuous surveillance of Masterson at the farm. At one point Agent West observed Masterson at the truck with the tonneau cover to the bed of the truck opened. At approximately 8:15 p.m., the agents observed the defendant leave the Baird Road area. Shortly after leaving, the agents observed him get out of the truck and confirm that the tonneau cover was securely fastened. Masterson then got on Interstate-91 heading south.

Agent West contacted the Vermont State Police and requested assistance in conducting a stop. At approximately 8:51 p.m., Trooper David Peterson responded to the request for assistance. Agent West informed Trooper Peterson that Masterson had crossed the border earlier that day carrying a large amount of currency. Agent West also informed Trooper Peterson that Masterson had transferred vehicles at the Burlington Airport, had stopped at the farm on Baird Road, and that the truck's tonneau cover had been open at the farm.

Trooper Peterson then encountered the truck being driven by Masterson. A video camera with audio capabilities in the trooper's vehicle was activated and it captured the rest of the evening's events. Trooper Peterson observed Masterson increasing

3

and decreasing speeds between sixty and seventy miles per hour, and also weaving within his lane.  Trooper Peterson was aware that these were possible signs of impaired driving, and conducted a vehicle stop for erratic operation.  Trooper Peterson testified that though he was aware of Masterson's earlier suspicious behavior, he felt he needed to establish his own probable cause for the traffic stop.

Trooper Peterson approached the car and asked for Masterson's license, registration and insurance card.  Trooper Peterson testified that immediately after explaining the reason for the stop, he noticed that the defendant appeared extremely nervous, was physically shaking, and that his speech was stammered.  Trooper Peterson continued to ask Masterson general questions about where he had been that day, where he was headed, and if he had been drinking; these are all standard questions after a traffic stop.  Trooper Peterson noticed that Masterson was unable to maintain eye contact, had trouble giving answers, and that some answers did not make sense or were inconsistent.  When asked how long he had been in Vermont, Masterson gave three different answers before settling on "since June or July."  When asked why he took an indirect route to his final destination, Masterson explained that he had tried to make a business contact along the route, but was unsuccessful due to poor cell phone service.  Trooper Peterson also observed that the truck was a

rental car that should have been returned days earlier.  After
this initial questioning, approximately five minutes had passed
since Masterson was stopped.  The officer testified that based on
Masterson's behavior, he believed that the defendant may have
been engaged in illegal activity.

Trooper Peterson then mentioned that people bring drugs and
other contraband across the border, and asked if Masterson was
involved in such activity.  Masterson denied any such
involvement, and Trooper Peterson then asked if he could search
the truck.  Masterson agreed orally and signed a consent card
authorizing a "complete" search of the truck.  Trooper Peterson
asked Masterson to wait with Trooper McGarvin, another Vermont
State Trooper who had arrived at the scene, by Trooper Peterson's
patrol vehicle while he searched the truck.

The search began approximately twelve minutes after the
initial stop.  Trooper Peterson completed his search of the
interior in fourteen minutes, or approximately twenty-six minutes
after the initial stop.  He then requested that Masterson give
him the keys to get under the locked tonneau cover, which
concealed the bed of the truck.  Masterson said that the keys
were in the glove box, but they were not, and Masterson
maintained that he did not have the keys.  After patting down
Masterson, Trooper Peterson was unable to find the keys on him.

Trooper Peterson then told Masterson that he knew about his

activities earlier that day, and that he did not believe that Masterson was telling the complete story. Trooper Peterson explained the defendant's options to him: the officer could use a screwdriver to get under the tonneau cover or to take the cover off, or he could call for a canine unit, which would not be at the scene for approximately twenty minutes. Masterson expressed concerns over using a screwdriver on the rental car since he would be responsible for any damage and told Trooper Peterson to "get the dog." Trooper Peterson then called for the canine unit. Approximately fifteen minutes passed from the completion of the search of the interior of the truck to when Masterson told Trooper Peterson to call the canine unit.

The canine arrived approximately twenty-two minutes later, and it alerted to the vehicle for the possible presence of drugs. Trooper Peterson told Masterson that he had probable cause to apply for a warrant to search the truck, and repeated his request for the keys to open the tonneau cover. Masterson again denied having the keys. Trooper Peterson told Masterson that he was going to seize the truck and apply for a warrant to search it. Approximately seventy minutes after the initial stop Trooper Peterson told Masterson that he was free to leave. Since Masterson was not allowed to walk along the interstate, however, Trooper Peterson offered Masterson either a ride to a road off the interstate or back to the barracks where he could make other

travel arrangements.  Trooper Peterson explained that Masterson would not be in custody if he chose to accept a ride, and Masterson agreed to go to the barracks.

Ultimately, law enforcement executed a state-issued warrant to search the truck.  In the bed of the truck were four large black nylon hockey bags which contained approximately 156 pounds of marijuana.  During the search of Masterson incident to his arrest, a set of small keys were found hidden in his jacket.  Trooper Peterson tested the keys on the tonneau cover and discovered that they worked to open it.

**DISCUSSION**

Consistent with the Fourth Amendment, a law enforcement officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).  Traffic stops are analogous to investigatory "*Terry* stops." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984).  The legality of investigatory stops is subject to a dual inquiry. *United States v. Sharpe*, 470 U.S. 675, 682 (1985).  First, it must be determined whether the stop was justified at its inception by a reasonable suspicion that criminal activity has or is about to occur. *Id.* (quoting *Terry*, 392 U.S. at 20).  Second, the detention must be "'reasonably related in scope to the circumstances which justified the

interference in the first place.'" *Id.*

The scope of intrusion permitted during an investigatory stop varies based on the circumstances of each case. *Florida v. Royer*, 460 U.S. 491, 499-500 (1983). However, the detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* at 500. "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Sharpe*, 470 U.S. at 686. If an investigatory stop "based on reasonable suspicion continues too long or becomes unreasonably intrusive, it will ripen into a *de facto* arrest that must be based on probable cause." *United States v. Glover*, 957 F.2d 1004, 1011 (2d Cir. 1992).

**A.  Scope of the Investigation**

Trooper Peterson's brief investigation of Masterson's erratic driving yielded an objective and reasonable suspicion to expand the scope of the investigation. During the course of a legal investigatory stop, if the officer develops an objective and particularized basis for suspecting additional wrongdoing, he

8

is justified in continuing the detention and directing questioning toward the additional wrongdoing.  *See, e.g., United States v. Jenkins*, 452 F.3d 207, 214 (2d Cir. 2006) (after the suspicion which justified the initial traffic stop had been dispelled, the odor of marijuana coming from the vehicle provided an additional reasonable suspicion of wrongdoing, and subsequent questioning about marijuana use was permissible).  In determining if there is reasonable suspicion the court must look at the "totality of the circumstances."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

During his initial investigation, Trooper Peterson asked several basic questions designed to verify or dispel his suspicion that Masterson was impaired.  He explained to Masterson why he had been stopped, asked if Masterson had been drinking, and discussed Masterson's travel plans.  Masterson asserts that at this point he should have been released, because Trooper Peterson had dispelled any suspicion that he was impaired.

It was during this initial period, however, that Trooper Peterson observed behavior that made him suspicious.  Trooper Peterson noticed that Masterson was extremely nervous, physically shaking, stammering, and failed to make eye contact.  Trooper Peterson also learned that Masterson was driving a rental car with an expired rental agreement, and had taken an indirect route to his final destination for a questionable reason.  Trooper

Peterson observed Masterson having trouble answering simple questions and giving inconsistent answers. Trooper Peterson was also aware of the information provided by Agent West concerning Masterson's earlier actions at the border, the airport, and the stop at the farm. Masterson's unusual behavior was enough to give Trooper Peterson a reasonable suspicion of criminal activity. *See Glover*, 957 F.2d at 1010-11 (defendant's heavy sweating, shaking nervously and giving questionable answers during a police encounter, among other factors, contributed to a reasonable suspicion of criminal activity); *United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991) (defendant's actions of shaking and acting extremely nervous, driving a rental car with a restricted license and giving conflicting responses about where he had been, gave the officer reasonable suspicion); *United States v. Soto*, 988 F.2d 1548, 1556 (10th Cir. 1993) (police observations of the defendant acting nervous, visibly shaking, and being unable to provide the address of the vehicle's owner, who was the defendant's uncle, gave rise to a reasonable suspicion to expand questioning during a traffic stop).

Only after establishing an articulable reasonable suspicion that additional criminal activity might be occurring did Trooper Peterson expand the scope of the detention. It was then that Trooper Peterson addressed the topic of drug smuggling, and eventually requested a search. *See Arizona v. Johnson*, 555 U.S.

__, 129 S. Ct. 781, 788 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."). The expansion of the investigation did not exceed the limits imposed by the Fourth Amendment.

**B.  Duration of the Detention**

There is no *per se* time limit on a permissible investigatory stop. *United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995) (citing *United States v. Place*, 462 U.S. 696, 709 (1983)). However, the stop must not last longer than is necessary to effectuate its purpose. *Royer*, 460 U.S. at 500. An important question is whether the police officer diligently pursued means of investigation that would be likely to dispel his suspicions "quickly." *Glover,* 957 F.2d at 1011 (quoting *Sharpe*, 470 U.S. at 686). The fact that a suspect's actions prolonged a detention should be considered when analyzing whether the police officer acted diligently. *See Sharpe*, 470 U.S. at 687-88 ("this case does not involve any delay unnecessary to the legitimate investigation . . . [the defendants] presented no evidence that the officers were dilatory in their investigation. The delay in this case was attributable almost entirely to the evasive actions of" the defendant.).

Here, Masterson offers no evidence that Trooper Peterson did

11

not act diligently in his investigation.  He relies solely on the duration of the detention in insisting that it was unreasonable.  After the brief initial conversation with Masterson, Trooper Peterson developed a reasonable suspicion that there was something illegal in the truck, which then justified prolonging the detention.  Trooper Peterson asked for consent to search Masterson's vehicle, and he received Masterson's voluntary consent to do so.  Trooper Peterson expeditiously performed the search of the vehicle's interior, which took approximately fourteen minutes.

If Trooper Peterson had been able to access the tonneau cover after his search of the inside of the truck, the entire investigation likely would have been completed in approximately thirty minutes.  A detention of this length, during a diligent investigation, can be considered a limited and justified intrusion under the Fourth Amendment.  *See Tehrani*, 49 F.3d at 61 (thirty minute detention for questioning and investigating the defendants' immigration status held reasonable); *Glover,* 957 F.2d at 1013 (thirty minute detention during an investigatory stop for questioning, background check and awaiting arrival of a canine unit held reasonable); *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (forty-five minute detention after a traffic stop, records check, questioning and canine sniff held reasonable).

The stop here was significantly prolonged because Masterson did not provide the keys to the tonneau cover. Masterson directed Trooper Peterson to the glove box for the keys, which extended the length of the search. When the keys could not be located, Masterson was given the choice of having the screwdriver used or having the canine unit come, and was informed that the canine unit would take approximately twenty minutes. Masterson chose the canine unit, which arrived after approximately twenty-two minutes. Given Masterson's agreement, the time spent waiting for the canine unit was not unreasonable. *See United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994) (en banc) (an hour detention following a traffic stop while waiting for the nearest canine unit held reasonable when the officer acted diligently); *United States v. Hardy*, 855 F.2d 753, 761 (11th Cir. 1988) (a fifty minute detention while awaiting a canine unit held reasonable).

As a result of Masterson's actions, the time necessary for Trooper Peterson to effectuate the purpose of the detention was extended. Trooper Peterson acted diligently to confirm his justified suspicions, and the duration of this detention was not unreasonable considering the circumstances that gave rise to its length.

**C. Consent to Search the Truck**

Masterson argues that his consent to search the truck

13

occurred when the stop had been illegally prolonged. Masterson therefore asserts that his consent was tainted by the illegality of the detention and ineffective to justify the resulting search. Masterson also argues that once Trooper Peterson completed the search of the interior of the truck, he withdrew his consent to search under the tonneau cover.

As discussed above, at the time Trooper Peterson received consent to search Masterson's truck, the scope and duration of the stop had been legally expanded based on a reasonable suspicion of additional criminal activity. Therefore, Masterson's initial consent to search occurred during the course of a legal detention and evidence discovered as a result is not tainted.

An individual may limit the scope of a search to which he or she consents. *Florida v. Jimeno*, 500 U.S. 248, 252 (1991). However, a withdrawal of consent "can only be accomplished by an unequivocal act or statement." *United States v. Siwek*, 453 F.3d 1079, 1086 (8th Cir. 2006) (finding that a defendant's statement that he lacked the key to the tonneau cover of his truck was not an effective withdrawal of consent). Masterson's consent authorized Trooper Peterson to search his truck, and at no time during the encounter did Masterson communicate to Trooper Peterson that he intended to limit or withdraw his consent to the search. His stated desire to avoid damage to the truck by the

14

use of a screwdriver, and his inability to locate the keys to the tonneau cover do not amount to an unequivocal withdrawal of consent.

Furthermore, when a suspect does not consent to a search, an officer may continue a detention and arrange for a canine sniff based on his reasonable suspicion. *See Glover*, 957 F.2d at 1013. Once a narcotics dog "hits on" an item, the police may then have probable cause to obtain a search warrant. *Id.* (citing *Royer*, 460 U.S. at 506). Here, whether or not Trooper Peterson had consent to continue his search, reasonable suspicion justified his calling for the canine unit. Once the canine unit "hit," he had the probable cause necessary to seize the truck and apply for a search warrant. It was this process that ultimately led to the discovery of the marijuana, not Masterson's consent.

**CONCLUSION**

For the foregoing reasons, the Court **denies** Masterson's Motion to Suppress (Doc. 25).


Dated at Burlington, Vermont this 29th day of July, 2009


/s/ William K. Sessions III
William K. Sessions III
Chief Judge

15